IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04cr271-1

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>vs. )<br>) **ORDER**<br>)<br>TRACY HOWARD )<br>_____ ) | |

On October 22, 2004 defendant Tracy Howard moved this Court to suppress evidence seized from his hotel room during a warrantless search by police. The Court conducted a suppression hearing on December 7, 2005, and thereafter denied Howard's motion. In reaching its conclusion, the Court in part relied on United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) and its progeny, and found that, notwithstanding Howard's earlier admonishing that the police could enter to search for a juvenile but "not [] poke around," the consent given by Howard's girlfriend, Keisha Burris, was sufficient to permit the police to enter and search the hotel room she shared with the defendant.

Howard now asks the Court to reconsider his motion in light of the Supreme Court's recent decision in Georgia v. Randolph, 547 U.S. ---, 126 S.Ct. 1515, --- L.Ed.2d ---- (March 22, 2006), and urges the Court to apply the exclusionary rule and suppress the evidence on the grounds that the search of the hotel room is now deemed illegal under Randolph. (Doc. No. 239) The Court, however, finds that Randolph does not apply in situations where the defendant is not physically present at the premises to be searched when consent is obtained. Therefore, for the reasons stated herein, the defendant's motion for reconsideration is denied.

1

# FINDINGS OF FACT

In early September 2004, the Charlotte-Mecklenburg Police Department received information that defendant Tracy Howard was distributing crack cocaine and running a prostitution ring that used run-away juveniles. The following day, Detective Matt Grimsley interviewed Howard's girlfriend, Keshia Burris, who had filed an assault report against Howard. Burris revealed that Howard routinely purchased large quantities of crack cocaine, owned three guns, and rented hotel rooms for girls he was prostituting. Burris said she would be willing to answer additional questions, though she never did.

Two weeks later, CMPD officers received information that a fourteen year-old female, who had been reported as "missing," was believed to be engaging in prostitution activities with Howard and Burris at the StudioPlus Hotel. When Detectives Grimsley and Temple responded that evening, they observed a gray Honda Civic used by Howard parked at the hotel. Hotel employees subsequently informed the detectives that Howard and Burris had checked-in and were staying in Room 301, although no one recalled seeing a female juvenile with them.

Aware that Howard had an active arrest warrant for assault on a female and did not have a driver's license, Detectives Grimsley and Temple began surveillance on the hotel room. At approximately 11:00 p.m., Howard and Burris left their room and drove-off in the Honda Civic. At the detectives' behest, Officers Harris and Goodwin initiated a traffic stop in front of the Chili's Restaurant a few blocks from the hotel. While Officer Harris removed Howard from the vehicle and placed him in handcuffs, Detective Grimsley walked up to the passenger side and spoke with Burris. He ask her "why she hadn't gotten back with [him]," and informed her of the "kind of situation she had gotten herself in." Grimsely testified that "[Burris] was upset . . . [and] didn't know why she had gotten back with Tracy." The detective then asked Burris if she would

walk with him to the area behind the Chili's, which she did. Grimsely then left Burris with another officer and returned to the front of the restaurant to speak with Howard.

Detective Grimsely explained the warrant (for assaulting a female) to Howard and asked if he would go downtown and voluntarily discuss some "some information about drugs and prostitution." Howard agreed. Grimsley then informed him that the police suspected that a fourteen year-old girl was inside his hotel room, and asked "for consent to search for that person in the room." According to Grimsley, Howard replied that he would consent to a search "for a body," although there was nobody else in the room, but that "he did not want [the police] poking around, [and] he had a little money in the room."[1]

Howard was taken downtown and Detective Grimsely resumed interviewing Burris. He explained about the missing juvenile and asked for her "consent to search the room for the fourteen year-old, drugs and guns." According to Grimsley, Burris, who was co-operating fully, recalled their prior conversation (about drugs and guns), but did not know if those items were in the room. Burris revealed that she had been living with Howard in room 301 of the StudioPlus Hotel for a few days, possessed her own access card, and had belongings in the room. The police escorted Burris to room 301, at which point Burris produced her own key card and opened the door for the officers.[2]

Upon entering the room, the officers immediately observed in plain view various drug

---

[1] At the second suppression hearing, Howard testified that he did not consent to any search or entry, but rather said to Grimsley "so what you want to do is just go in my [] room and look for a body [?] . . . [N]ah man [] got money I had hid inside my room [.] [Y]ou can't go in and search my room." To the extent that Howard's testimony conflicts with Detective Grimsley's, the Court finds the detective's testimony significantly more credible.

[2] Howard testified that there was only one room access card, which was on his person and seized by the police. Again, the Court finds Detective Grimsely's testimony more credible.

paraphernalia, including plastic bags and twist-offs lying on the dresser, and a scale, a razor blade, and a bag of crack cocaine on the kitchen counter. Also on the counter were identification cards for Tracy Howard and Allison Walkers, the latter being an alias used by Burris. While the officers began searching for guns and other drugs, Burris was allowed to sit on the couch and tend to her cat and kittens (who also were staying in the hotel room). Detective Grimsley observed bags of crack cocaine behind a roll of toilet paper on the kitchen counter, and zip-lock baggies in a kitchen drawer. Detective Temple located money stuffed in a shoe in a closet. And Officer Hildebrand discovered in a bed-side table a loaded pistol, which had been concealed in a "do-rag," and a check made out to Tracy Howard. After completing the search, Detective Grimsley informed Burris that she would be arrested for the drugs, drug paraphernalia and the gun discovered in her room.

## OPINION

The narrow issue before this Court is whether, under the circumstances present in the instant case, Georgia v. Randolph, 547 U.S. ---, 126 S.Ct. 1515, --- L.Ed.2d ---- (March 22, 2006) requires the suppression of the evidence seized from Room 301 of the StudioPlus Hotel. Having reviewed the record, the Court finds that it does not. Whereas the defendant in Randolph was present and objecting at the place and time of the search, Howard was absent when Burris allowed the police to enter and search the hotel room. Furthermore, given Howard's limited consent to look for a juvenile in the room (but not to "poke around"), the presence of drug paraphernalia in plain view, and Keisha Burris's subsequent arrest in the instant case, the drugs and drug paraphernalia, the cash found in the defendant's shoe, and the gun are admissible under the doctrine of inevitable discovery.

4

1. Application of <u>Georgia v. Randolph</u>

The law is well-settled that a warrantless entry and search of a premises can be sustained on the consent of a third party who possesses common authority over the premises. <u>United States v. Matlock</u>, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (holding that a joint-occupant assumes the risk that his co-occupants may expose their "common private areas" to a search). Such consent is valid against an absent, non-consenting defendant with whom authority is shared, notwithstanding that the defendant was known by police to be present in the residence or near the scene. 415 U.S. at 170, 94 S.Ct. 988; <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Furthermore, all federal circuit courts and a large majority of state courts, including the Fourth Circuit and North Carolina, have held that, under <u>Matlock</u>, consent to a search given by a co-occupant cannot be revoked by another co-occupant's refusal of consent. See <u>Randolph</u>, 547 U.S. ---, 126 S.Ct at 1520 (listing cases); <u>United States v. Sumlin</u>, 567 F.2d 684, 688 (6th Cir. 1977), <u>cert.</u> <u>denied</u>, 435 U.S. 932 (1978) ("[w]e cannot see how the additional fact of [a defendant's] initial refusal to consent in any way lessened the risk assumed that his co-occupant would consent"); <u>United States v. Smalls</u>, No. 92-5707, 1 F.3d 1235, 1993 WL 303309, at *3 (4th Cir. August 9, 1993) (unpublished table decision) ("we join the other Circuits that have ruled an officer may seek permission to search from a third party with common authority after a suspect refuses the officer's initial request"); <u>State v. Washington</u>, 86 N.C.App. 235, 357 S.E.2d 419, 427 (1987) (dicta) (same).

However, in <u>Randolph</u>, the Supreme Court found that the risk assumed by a co-occupant is only "an inability to control access to the premises during one's absence," and therefore held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by

5

a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. ---, 126 S.Ct at 1520, 1526. The assessment of the reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another was based on the Court's interpretation of "widely shared social expectations" which are influenced, but not controlled, by property law. While co-tenants normally are confident that each has the right to admit guests in the other's absence, regardless of how obnoxious the absent tenant might find the guest,

> "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions."

Id. at 1522-1523. Thus, since a joint-tenant wishing to open the door to police has no recognized authority, in law or social custom, to prevail over a present and objecting co-tenant, a police officer faced with disputed consent has no better claim to reasonableness in entering than the officer would have absent any consent.

In Randolph, police officers arrived at the defendant's front door pursuant to a domestic disturbance complaint. The defendant's wife informed the officers that her husband was in possession of cocaine. When asked for his consent, the defendant unequivocally refused permission to search the house. The officers, however, immediately asked and obtained consent from the defendant's wife and then made entry.

The instant case differs in that Detective Grimsely was not faced with the physical presence of co-occupants, one consenting to the search and the other objecting contemporaneously. Howard was absent from the colloquy on which the police relied for consent to enter and search, and thus there was no immediate challenge. He voiced his refusal several

6

blocks away from the hotel, prior to the first time the police asked Burris for her consent, and prior to the time when Burris used her own room access card to allow the officers entry into the room. Therefore, the issue before the Court is whether, under Randolph, Howard's *separate, prior* refusal prevails over Burris's later consent when she allowed the officer's to enter the hotel room. Based on the record before it, the Court finds that it does not.

Having examined Randolph, it is clear the Supreme Court expressly and repeatedly limited its application of the exclusionary rule to a physically presented objecting co-occupant. See Randolph, 547 U.S. ---, 126 S.Ct at 1519 ("We hold that, in the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry..."); at 1520 (against a co-tenant who is present [and refuses]"); id. ("None of our co-occupant consent-to-search cases, however, has presented the further fact of a second occupant physically present and refusing permission to search"); at 1522 ("[a]lthough we have not dealt directly with the reasonableness of police entry in reliance on consent by one occupant subject to immediate challenge by another"); at 1523 ("Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant"); at 1527 ("we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search"); at 1528 ("a physically present inhabitant's express refusal of consent to a police search is dispositive as to him"); id. ("[t]he objecting party was present and made his objection known clearly and directly to the officers seeking to enter the house"); at 1530 (stating that the Court's opinion does not apply where the objector is not present "and object[ing]") (Breyer, concurring).

The is nothing in the language of the opinion to suggest that Randolph applies to situations where, as in the instant case, the objector is not physically present at the place to be

7

searched when consent is given. Thus, the Court finds that since Tracy Howard was not present when Burris gave the police access and permission to search to the hotel room, his prior "contrary indication" (that the police not "poke around" in the hotel room) did not invalidate her consent or make the entry or search of the hotel room unlawful.

2.  Inevitable Discovery

However, even if Georgia v. Randolph applies to the instant case to make the officers' search of the nightstand drawer and shoe in the closet unlawful, the Court would find that the evidence found therein need not be suppressed. The inevitable discovery doctrine provides that "information obtained by unlawful means is nonetheless admissible " '*[i]f* the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.' " United States v. Allen, 159 F.3d 832, 838 (4th Cir. 1998) (quoting Nix v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)) (emphasis in original). This doctrine recognizes that the deterrence rationale of the exclusionary rule is not served by suppression of evidence that would have been discovered by legal means. Id. at 839.

The doctrine may apply where the facts show that the evidence would have been uncovered in a search that falls within an exception to the warrant requirement, such as a search incident to arrest. Id. at 841 (citing United States v. Cotnam, 88 F.3d 487, 496 (7th Cir. 1996)). The search incident to arrest exception allows officers to search an arrested person and any area in her immediate control without a search warrant to protect them from danger and prevent the destruction of evidence. Chimel v. California, 395 U.S. 752, 768, 89 S. Ct. 2034, 2042, 23 L.Ed.2d 685 (1969); United States v. Holmes, 376 F.3d 270, 279 (4th Cir. 2004). In Cotnam, a defendant allowed police to enter his motel room, but did not consent to a search of the room. 88

F.3d at 495. Once inside the motel, the officers observed marijuana in plain view on the bed; therefore, they had probable cause to arrest him. Id. Searches of the defendant and the room prior to the formal arrest of the defendant revealed additional incriminating evidence. Id. at 491, 496. The Seventh Circuit stated it would have been preferable for the officers to arrest the defendant immediately upon seeing the marijuana, but found that the evidence discovered during searches of the room and the defendant's jacket would have been found incident to his arrest before the officers left the motel room. Id. Thus, the district court did not err in refusing to suppress the evidence. Id.

Here, the Court finds that Howard gave permission to Detective Grimsley to search the motel room for a body. Therefore, the officers lawfully entered the motel room with the defendant's consent. Upon entering, they observed incriminating items in plain view, including crack cocaine, plastic bags for packaging drugs, a scale, and a razor blade. The presence of such items established probable cause for the officers to arrest Keisha Burris for possession of crack cocaine with intent to distribute and possession of drug paraphernalia. Although the officers did not formally arrest Burris until after searching the room, the Court finds that the officers would have arrested her for the items in plain view, even if they had not searched the room. Upon arresting Burris, the officers would have properly conducted a search incident to her arrest of the motel room. Given the small size of the room, the Court finds that the entire room was within Burris' immediate control and within the lawful scope of a search incident to her arrest. Accord Cotnam, 88 F.3d at 496. The officers would have found the gun in the nightstand and the money in the closet during such a search. Therefore, none of the evidence found in the motel room will be suppressed.

CONCLUSION

In conclusion, in light of the evidence presented, the Court finds that 1) because defendant Tracy Howard was not physically present at the hotel room when Burris allowed the officers' entry, his *separate, prior* refusal did not prevail over Burris's consent; and 2) the evidence found in the hotel room prior to Burris's official arrest (i.e., the cash in Howard's shoe, the gun in the night-stand, and the drugs and drug paraphernalia not observed in plain-view) are admissible under the inevitable discovery rule since Burris's arrest and the search of the hotel room incident to arrest were inevitable when the officers observed in plain view drugs and drug paraphernalia on the kitchen counter.

**THEREFORE, IT IS HEREBY ORDERED** that, for the foregoing reasons, Defendant's Motion to Reconsider the Denial of His Motion to Suppress evidence seized from his hotel room is **DENIED**.

Signed: April 21, 2006

Robert J. Conrad, Jr.
United States District Judge